IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DESMOND R. LILES, | ) | CASE NO. 1:15 CV 1776 |
| | ) | |
| Petitioner, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| AL LAZAROFF, | ) | |
| | ) | |
| Respondent. | ) | **REPORT & RECOMMENDATION** |

## Introduction

Before me[1] is the petition of Desmond R. Liles for a writ of habeas corpus under 28 U.S.C. § 2254.[2] Liles was convicted by a Allen County Court of Common Pleas jury in 2013 of felonious assault with a gun specification and having a weapon while under disability[3] and is serving 13 years.  He is currently incarcerated at the Mansfield Correctional Institution in Mansfield, Ohio.[4]

---

[1] This matter was referred to me under Local Rule 72.2 by United States District Judge Jeffrey J. Helmick by non-document order dated September 8, 2015.

[2] ECF # 1.

[3] *Id*. at 2.

[4] Ohio Department of Corrections www.drc.ohio.gov/offendersearch.

Liles raises one ground for habeas relief.[5] The State has filed a return of the writ arguing that the petition should be dismissed as procedurally defaulted in part and is otherwise without merit.[6] Liles has filed a traverse.[7]

For the reasons that follow, I will recommend Liles's petition be dismissed.

## Facts

### A.    Underlying facts, conviction, and sentence

The facts that follow come from the decision of the appeals court.[8]

The victim, Anthony S. Brown, testified that, on July 15, 2012,  he and Byron Holten had gone to the store together to buy snacks and then head to Stu's[9] house to hang out.[10] Brown testified that Holten saw that he had money when he was purchasing snacks at the store.[11]  Afterward, Brown stated that he left Stu's house at some point during that day, but Holten remained at the house.[12]

---

[5] ECF # 1.

[6] ECF # 6.

[7] ECF # 7.

[8]  Facts found by the state appellate court on its review of the record are presumed correct by the federal habeas court. 28 U.S.C. § 2254(e)(1); *Mason v. Mitchell*, 320 F.3d 604, 614 (6th Cir. 2003) (citing *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981)).

[9] The state appellate opinion does not identify "Stu" by a last name.

[10] ECF # 6, Attachment 2 at 88.

[11] *Id*.

[12] *Id*.

According to Brown, when he returned to Stu's house, he sat in the back room, smoked marijuana, and watched TV, when Holten received a phone call on his cell phone.[13] Brown testified that, after receiving the phone call, Holten left Stu's house, and, about an hour and forty-five minutes later, Brown heard the door to Stu's house being kicked in.[14] Brown stated that he looked down the hallway and saw three guys wearing black masks and gloves.[15] The masked men came down the hallway with rifles raised in the air yelling for him to get down on the ground, which Brown did.[16]  Brown testified that the men asked him where his money was, and he told them it was in a zipper pocket of his pants.[17]  None of the men wanted to grab for the money, according to Brown, so they removed his pants and ran out the door, leaving him only in his "drawers."[18]

Brown testified that, as he was walking out the front door, he noticed Stu and his girlfriend sitting in the house, and the masked men walked right by them and never ordered them to lie on the ground.[19]  Brown stated that the masked men stole $1,000 – money that he received from the recent sale of his tow truck, which he sold to pay taxes he owed on his

---

[13] *Id.*

[14] *Id.* at 89.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

home.[20]  Brown immediately suspected that "the same guys [he] sees every day" might have been involved in the robbery, and that Holten might have been involved since the masked men also walked right by him.[21]

Brown stated that the next day he told his sister, Kierra Brown about the incident; they then went to his brother's house, Jordan Brown, and told him and Martyce McLaurin about the robbery.[22]  Brown testified that Martyce called their cousin, DeAngelo Harper, and began questioning him about the incident because he was known to frequent Stu's house.[23]  Harper told Martyce to come over, so Brown and his brothers drove over to Orena Street, and Harper walked down the street to Liles' grandmother's house and stated to Brown's brothers "they got guns."[24]  Harper went to Liles' grandmother's house, and Liles and another guy exited the house and took off in a jeep.[25] Shortly thereafter, Liles and the other man returned to the grandmother's house, so Brown suspected that they may have retrieved the weapon.[26]

---

[20] *Id.*

[21] *Id.*

[22] *Id.* at 90.

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

Brown testified that he went to Liles' grandmother's house because he suspected that Harper may have stated something to Liles that wasn't true.[27]  Brown stated that he observed a black glove lying on the porch of the grandmother's house – which is right around the corner from where Brown was robbed – so Brown " instantly, like, put two and two together."[28]  Brown then picked up the glove, but someone snatched it out of his hand, stating "no, like it's nothing like that," at which point Brown walked off the porch and began heading back to his vehicle.[29]  As he was walking, he observed Liles exit the house with his cousin, Montray, and another man, and Liles "did tuck something like he got a weapon."[30]  Brown then approached the group of people that were with him and Liles and tried to "level things out" so a fight did not erupt.[31]

Brown testified that Liles began saying nasty words, at which point Brown's younger brother punched Liles.[32]  Liles's cousin then tackled his younger brother, so Brown began trying to pull him off.[33]  Meanwhile, someone grabbed Brown from behind, when Brown

---

[27] *Id*. at 91.

[28] *Id*.

[29] *Id*.

[30] *Id*.

[31] *Id*.

[32] *Id*.

[33] *Id*.

-5-

heard a "pow" and turned around to see Liles with a gun in his hand looking confused.[34] Brown testified that after he heard the "pow" his leg shifted, but it did not hurt and no one was behind him so he could not figure out what happened.[35]  Brown then took off running and then collapsed.[36]  Brown testified that he was in the street when he was shot.[37]

Brown knew Liles before the shooting but was not friends with him.[38] He was hospitalized about a week for the gunshot wound and still has pain in his hip from the wound.[39]  Brown testified that he did not see anyone with a weapon except Liles and that he was four or five feet behind him when he was shot.[40]

On cross examination, Brown testified that he could not identify Liles as one of the robbers.[41]

Kierra Brown testified that on July 16, 2012, she arrived at Liles' grandmothers house with her four brothers Anthony, Martyce, Trayvon, and Jordan.[42]  A fight ensued, and Brown

---

[34] *Id.*

[35] *Id.* at 91-92.

[36] *Id.* at 92.

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.* at 93.

was trying to break up the fight when she observed Liles pull a gun out from his jogging pants, so she and her eldest brother started yelling "He got a gun; he got a gun," but no one could hear them because of the commotion.[43]  Kierra stated that Liles pulled the gun up to Brown's head, but they caught Liles' attention with their screaming, he then stepped back and shot Brown "downward."[44] According to Kierra, Liles froze up, almost in shock, and then took off running through the alley.[45]  Kierra testified that she did not see anyone else with a weapon.[46]

On cross-examination, Kierra testified that, in exchange for her truthful testimony, one of the detectives agreed to drop her warrants, and without that promise, she probably would not be testifying.[47]  On re-direct, Kierra clarified that her mom told her that a detective promised to drop warrants on her if she testified, but no detective told her that directly.[48]

Lima Police Detective Kent Miller testified that Kierra Brown does not have any warrants through the Lima Police Department, and he never promised to withdraw any of her

---

[43] *Id*.

[44] *Id*. at 93-94.

[45] *Id*. at 94.

[46] *Id*.

[47] *Id*.

[48] *Id*.

warrants in exchange for her testimony at trial.[49]  Miller testified that no warrants were being

dismissed in exchange for Kierra's testimony.[50]

Miller further testified as lead detective on the case, he reported to Orena Street in

response to a shooting.[51]  He stated that law enforcement was unable to locate a bullet or a

gun during their investigation.[52]  Miller further testified that he talked to several potential

eyewitnesses though none were cooperative.[53]  On July 17, 2016, Miller and another

detective attempted to interview the victim at the hospital, but Brown's heart rate and blood

pressure elevated when they brought up the shooting.[54]  Miller stated that he gave a business

card to Brown's grandmother, Dority, and asked her to call him when Brown was able to

talk.[55]  Miller testified that Dority called him around July 19th and after that conversation, law

enforcement began to suspect Liles was the shooter.[56]

---

[49] *Id*. at 98.

[50] *Id.* at 99.

[51] *Id*.

[52] *Id*.

[53] *Id*.

[54] *Id*.

[55] *Id*.

[56] *Id*.

Miller testified that he interviewed Brown and Kierra Brown, and their statements were consistent with the evidence he had gathered implicating Liles as the shooter.[57] Miller also contacted a female, Johnnie Mae Qualls, who lives approximately five houses north of the scene of the shooting, as a possible eye witness.[58] Miller testified that Qualls' statements demonstrated that she observed the shooting, and her statements were consistent with those offered by Brown and Kierra Brown.  But, Qualls subsequently made it clear, that she did not want to cooperate with the investigation.  Miller stated that, based on his investigation, he was certain that Liles is the person who shot Brown.[59]

The State then moved to admit exhibits 1 through 35, which were admitted without objection, and rested.[60]  The defense made a Crim.R.29(A) motion, which was denied.[61]

The defense presented the testimony of two witnesses.[62]  Johnnie Mae Qualls testified that on July 16, 2012, she saw a bunch of boys stop in the middle of the street and began arguing.[63]  She later heard a shot and "[t]hen one of them ran across an empty lot and fell, and then he got up and continued to, well they say to Harrison Street.  I didn't move out of

---

[57] *Id*. at 100.

[58] *Id*.

[59] *Id*.

[60] *Id*.

[61] *Id*. at 102.

[62] *Id*.

[63] *Id*. at 102-103.

my chair."[64] Qualls did not recognize the individual running away and could not testify who fired the shot.[65]

On cross-examination Qualls denied telling Detective Miller, on the day of the incident, that she saw a man who was taller that the rest of the other boys pull out a large handgun and shoot.[66] When asked if she told Detective Miller that she witnessed the taller man try to hand to gun to someone who would not take it, Qualls testified, "[m]aybe I did" and then, "okay".[67]

Qualls further testified that Detective Miller called her prior to the trial, and she refused to testify against Liles, because she lives in a bad neighborhood and is 77 years old and cannot run and hide.[68] She admitted that she told Detective Miller that she could not testify "cause he was going to get [her] burned out," though she testified that she really did not want to testify due to her poor physical health."[69] On redirect, Qualls testified that no one from Liles' family threatened her not to testify at trial, and she does not fear his family because "[t]hey're like my family."[70]

---

[64] *Id*. at 103.

[65] *Id*.

[66] *Id*.

[67] *Id*.

[68] *Id*. at 104.

[69] *Id*.

[70] *Id*.

Patrolman Aaron Rode testified that he spoke with Kierra Brown at the scene of the shooting, and that she did not identify the shooter at that time.[71]  On cross-examination, Rode stated that the scene was very chaotic and, when he arrived, Kierra was on her cell phone.[72] He further testified that it was difficult to even get basic information from Kierra because she was several feet away from her injured brother.[73] Rode also stated that, in his experience, people are "almost never" forthcoming about what happened when they are still at the scene of the crime.[74]

Thereafter, the defense rested, and the State did not present any witness on rebuttal.[75] The matter was submitted to the jury who returned guilty verdicts on all three counts.[76]

---

[71] *Id*.

[72] *Id*.

[73] *Id*. at 104-105.

[74] *Id*. at 105.

[75] *Id*.

[76] *Id*.

**B.     Direct Appeal**

*1.     Ohio court of appeals*

Liles, through counsel, filed a timely[77] notice of appeal[78] with the Ohio Court of

Appeals. In his brief, Liles raised the following assignments of error:

> 1.     Desmond Liles was deprived of his constitutional rights under the Fifth,
>        Sixth, and Fourteenth Amendments to the United States Constitution,
>        and Sections 10 and 16, Article I of the Ohio Constitution when trial
>        counsel failed to object to improper testimony.
>
> 2.     The trial court violated Desmond Liles' rights to due process and a fair
>        trial when it entered a judgment of conviction for Felonious Assault and
>        Having a Weapon While Under Disability when the judgments were
>        against the manifest weight of the evidence.  Fifth and Fourteenth
>        Amendments to the United States Constitution and Section 16, Article
>        I of the Ohio Constitution.[79]

The state filed a brief in response.[80] The Ohio appeals court overruled both

assignments of error and affirmed the decision of the trial court.[81]

---

[77]  Under Ohio App. Rule 4(A), to be timely, a party must file a notice of appeal within 30 days of the judgment being appealed. *See*, *Smith v. Konteh*, No. 3:04CV7456, 2007 WL 171978, at *2 (N.D. Ohio Jan. 18, 2007) (unreported case). Liles's conviction and sentence were journalized on January 23, 2013 (*id.* at 12) and the notice of appeal was filed on February 1, 2013. *Id.* at 19.

[78]  *Id.* at 48.

[79]  *Id*. at 28.

[80]  *Id.* at 71.

[81]  *Id.* at 84.

2.      *The Supreme Court of Ohio*

Liles, through counsel, thereupon filed a timely[82] notice of appeal with the Ohio Supreme Court.[83] In his brief in support of jurisdiction, he raised the following two propositions of law:

1.    Trial counsel provides ineffective assistance, in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution, for failing to timely object to improper testimony.

2.    A trial court violates a defendant's rights to due process and a fair trial when it finds the defendant guilty when the evidence [*sic*] against the manifest weight.  Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.[84]

On June 11, 2014, the Ohio Supreme Court declined to accept jurisdiction of the appeal pursuant to S.Ct.Prac.R. 7.08(B)(4).[85]

_____

[82] *See* Ohio S.Ct.Prac.R. 7.01(A)(5)(b) (To be timely, a notice of appeal must be filed within 45 days of entry of the appellate judgment for which review is sought.); *See*, *Applegarth v. Warden*, 377 F. App'x 448, 450 (6th Cir. 2010) (discussing forty-five day limit) (unreported case).  Here, the appellate judgment was entered on January 27, 2014, and the notice of appeal filed in the Supreme Court on March 13, 2014. *Id*. at 117.

[83] *Id.* at 117.

[84] *Id*. at 120.

[85] *Id*. at 164.

C.    **Petition for writ of habeas corpus**

On September 1, 2015, Liles, through counsel, timely filed[86] a federal petition for

habeas relief.[87] As noted above, he raises one ground for relief:

> GROUND ONE:    Desmond Liles was denied the effective assistance of
> counsel, in violation of his rights under the Sixth and
> Fourteenth Amendments to the United States
> Constitution.

> Supporting Facts:    In prosecuting an alleged felonious assault where identity
> of the shooter was the question for the jury, the
> prosecution introduced testimony from two witnesses
> who each claimed that Mr. Liles had been released from
> prison recently for a similar crime and introduced
> opinion testimony from the lead investigator as to which
> conflicting story by a key State witness was more
> reliable.  Defense counsel failed to object to any of these
> questions and did not seek sufficient curing instructions
> as to any of this testimony.[88]

## Analysis

A.    **Preliminary observations**

Before proceeding further, I make the following preliminary observations:

---

[86]  The present petition for federal habeas relief was filed on September 1, 2015. ECF
# 1. Although the present petition was filed more than one year after the decision of the Ohio
Supreme Court dismissing Liles's appeal, the United States Supreme Court teaches that for
purposes of computing the time within which a petitioner may file for habeas relief, the one
year period imposed by statute shall not begin until the ninety day period for seeking a writ
of certiorari has expired, regardless of whether the petitioner actually seeks such relief or not.
*Lawrence v. Florida*, 549 U.S. 327, 333 (2007). Thus, the present petition is timely.

[87] ECF # 1.

[88] *Id*. at 6.

-14-

1.    There is no dispute that Liles is currently in state custody as the result of his conviction and sentence by an Ohio court, and that he was so incarcerated at the time he filed this petition. Thus, he meets the "in custody" requirement of the federal habeas statute vesting this Court with jurisdiction over the petition.[89]

2.    There is also no dispute, as detailed above, that this petition was timely filed under the applicable statute.[90]

3.    In addition, Liles states,[91] and my own review of the docket of this Court confirms, that this is not a second or successive petition for federal habeas relief as to this conviction and sentence.[92]

4.    Moreover, subject to the procedural default arguments raised by the State, it appears that these claims have been totally exhausted in Ohio courts by virtue of having been presented through one full round of Ohio's established appellate review procedure.[93]

5.    Finally, because Liles is represented by counsel, he has not requested the appointment of counsel,[94] nor has he requested an evidentiary hearing to develop the factual bases of his claims.[95]

---

[89] 28 U.S.C. § 2254(a); *Ward v. Knoblock*, 738 F.2d 134, 138 (6th Cir. 1984).

[90] 28 U.S.C. § 2254(d)(1);  *Bronaugh v. Ohio*, 235 F.3d 280, 283-84 (6th Cir. 2000).

[91] *See*, ECF # 1 at 13.

[92] 28 U.S.C. § 2254(b); *In re Bowen*, 436 F.3d 699, 704 (6th Cir. 2006).

[93] 28 U.S.C. § 2254(b); *Rhines v. Weber*, 544 U.S. 269, 274 (2005); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).

[94] 28 U.S.C. § 2254(h); Rule 8(c), Rules Governing 2254 Cases.

[95] 28 U.S.C. § 2254(e)(2).

**B.** **Standards of review**

*1.* *AEDPA review*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),[96], codified at 28 U.S.C. § 2254, strictly circumscribes a federal court's ability to grant a writ of habeas corpus.[97]  Pursuant to AEDPA, a federal court shall not grant a habeas petition with respect to any claim adjudicated on the merits in state court unless the state adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding.[98]

The Supreme Court teaches that this standard for review is indeed both "highly deferential" to state court determinations,[99] and  "difficult to meet,"[100] thus, preventing

---

[96] Pub. L. No. 104-132, 110 Stat. 1214 (1996).

[97]  *See* 28 U.S.C. § 2254 (2012).

[98]  28 U.S.C. § 2254(d) (2012).

[99] *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citation omitted).

[100]  *Id.* (citation omitted).

petitioner and federal court alike "from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts."[101]

1.      *"Contrary to" or "unreasonable application of" clearly established federal law*

Under § 2254(d)(1), "clearly established Federal law" includes only Supreme Court holdings and does not include dicta.[102]  In this context, there are two ways that a state court decision can be "contrary to" clearly established federal law:[103] (1) in circumstances where the state court applies a rule that contradicts the governing law set forth in a Supreme Court case,[104] or (2) where the state court confronts a set of facts that are materially indistinguishable from a Supreme Court decision, but nonetheless arrives at a different result.[105]  A state court's decision does not rise to the level of being "contrary to" clearly established federal law simply because that court did not cite the Supreme Court.[106]  The state court need not even be aware of the relevant Supreme Court precedent, so long as neither its reasoning nor its result contradicts it.[107]  Under the "contrary to" clause, if materially indistinguishable facts confront the state court, and it nevertheless decides the case

---

[101] *Rencio v. Lett*, 559 U.S. 766, 779 (2010).

[102] *Howes v. Fields*, 132 S.Ct. 1181, 1187 (2012) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

[103]  *Brumfield v. Cain*, 135 S.Ct. 2269, 2293 (2015).

[104]  *Id.*

[105]  *Id.*

[106]  *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (per curiam).

[107]  *Id.*

differently than the Supreme Court has previously, a writ will issue.[108]  When no such
Supreme Court holding exists the federal habeas court must deny the petition.

A state court decision constitutes an "unreasonable application" of clearly established
federal law when it correctly identifies the governing legal rule, but applies it unreasonably
to the facts of the petitioner's case.[109]  Whether the state court unreasonably applied the
governing legal principle from a Supreme Court decision turns on whether the state court's
application was objectively unreasonable.[110]  A state court's application that is "merely
wrong," even in the case of clear error, is insufficient.[111]  To show that a state court decision
is an unreasonable application, a petitioner must show that the state court ruling on the claim
being presented to the federal court "was so lacking in justification that there was an error
well understood and comprehended in existing law beyond any possibility for fairminded
disagreement."[112]  Under the "unreasonable application" clause, the federal habeas court must
grant the writ if the State court adopted the correct governing legal principle from a Supreme
Court decision, but unreasonably applied that principle to the facts of the petitioner's case.

---

[108]  *See id.*

[109]  *White v. Woodall*, 134 S.Ct. 1697, 1699 (2014) (quoting *Williams v. Taylor*, 529
U.S. 362, 407 (2000).

[110]  *Id.*(quoting *Lockyear v. Andrade*, 538 U.S. 63, 75-76. (2003).

[111]  *Id.*

[112]  *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

-18-

2.      *"Unreasonable determination" of the facts.*

The Supreme Court has recognized that § 2254(d)(2) demands that a federal habeas court accord the state trial courts substantial deference:[113]   Under § 2254(e)(1), "a determination of a factual issue made by a [s]tate court shall be presumed to be correct."[114] A federal court may not characterize a state court factual determination as unreasonable "merely because [it] would have reached a different conclusion in the first instance."[115] While such deference to state court determinations does not amount to an "abandonment or abdication of judicial review"or "by definition preclude relief,"[116] it is indeed a difficult standard to meet.  "The role of a federal habeas court is to guard against extreme malfunctions in the state criminal justice systems, not to apply *de novo* review of factual findings and to substitute its own opinions for the determination made on the scene by the trial judges."[117]

---

[113]  *Brumfield*, 135 S.Ct. at 2277.

[114] 28 U.S.C. § 2254(e)(1) (2012).

[115]  *Brumfield*, 135 S.Ct. at 2277 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010).

[116]  *Id.* (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination.") (internal quotation marks omitted)).

[117] *Davis v. Ayala*, 135 S.Ct. 2187, 2202 (2015) (citation omitted).

-19-

2.      *Procedural default*

A claim not adjudicated on the merits by a state court is not subject to AEDPA review.[118]  Such a claim is subject to procedural default if a petitioner failed to raise it when state court remedies were still available, the petitioner violated a state procedural rule.[119]  The petitioner must afford the state courts "opportunity to pass upon and correct alleged violations of its prisoners' federal rights."[120]  This requires a petitioner to go through "one complete round" of the state's appellate review process,[121] presenting his or her claim to "*each* appropriate state court."[122]  A petitioner may not seek habeas relief then if he or she does not first "fairly present[] the substance of his [or her] federal habeas corpus claim to the state courts."[123]

When a state asserts a that violation of a state procedural rule is the basis for default in a federal habeas proceeding, the Sixth Circuit has long employed a four-part to test determine whether the claim is procedurally defaulted.[124]  A petitioner's violation of a state

---

[118] *See Harrington v. Richter*, 562 U.S. 86, 98 (2011).

[119] *West v. Carpenter*, 790 F.3d 693, 697 (6th Cir. 2015).

[120] *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam) (citation omitted).

[121] *Boerckel*, 526 U.S. at 845.

[122] *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (emphasis added).

[123] *West*, 790 F.3d at 697 (quoting *Picard v. Connor*, 404 U.S. 270, 278 (1971) (internal quotation marks omitted).

[124] *See Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986) (outlining four-part test); *see Landrum v. Mitchell*, 625 F.3d 905, 916-17 (6th Cir. 2010) (applying test post-AEDPA).

procedural rule will bar federal review if the state procedural rule satisfies the standards set out in the test:[125]

(1) "[T]here must be a state procedure in place that the petitioner failed to follow."[126]

(2) "[T]he state court must have denied consideration of the petitioner's claim on the ground of the state procedural default."[127]

(3) "[T]he state procedural rule must be an 'adequate and independent state ground,'[128] that is both 'firmly established and regularly followed.'"[129]

(4) The petitioner cannot demonstrate either "cause for the default and actual prejudice as a result of the alleged violation of federal law," or "that failure to consider the claims will result in a fundamental miscarriage of justice."[130]

In order to show "cause" for the default, the petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."[131] In order to show "prejudice" for the default, the petitioner must show that the errors

---

[125] *Jells v. Mitchell*, 538 F.3d 478, 488 (6th Cir. 2008).

[126] *Id.* (citing *Maupin*, 785 F.2d at 138).

[127] *Id.*

[128] *Id.* (quoting *Maupin*, 785 F.2d at 138). ("A state procedural rule is an independent ground when it does not rely on federal law.") (citing *Coleman v. Thompson*, 501 U.S. 722, 732).

[129] *Id.* (citation omitted).

[130] *Id.* (quoting *Coleman*, 501 U.S. at 750).

[131] *Id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

at trial "worked to [his or her] *actual* and substantial disadvantage, infecting [the] entire trial with error of constitutional dimensions."[132]

Additionally, "a credible showing of actual innocense" may also excuse an otherwise defaulted claim, and effectively allow a petitioner to seek review.[133]

Notwithstanding these elements, the Supreme Court has held that a federal habeas court need not consider an assertion of procedural default before deciding a claim against the petitioner on the merits.[134]

### 3.    *Ineffective assistance of counsel*

In *Higgins v. Renico*,[135] the Sixth Circuit re-stated the foundational rubric for reviewing claims of ineffective assistance of counsel pursuant to the long-standing teaching of *Strickland v. Washington*:[136]

---

[132] *Id.* (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

[133] *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1931 (2013); *see Schulp v. Delo*, 513 U.S. 298, 324 (1995) (explaining that a "credible" claim requires "new reliable evidence" and factual innocence beyond legal insufficiency).

[134] *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997); *see Wade v. Timmerman-Cooper*, 785 F.3d 1059, 1077 (6th Cir. 2015) ("[O]n occasion [the Sixth Circuit] has reached beyond the procedural-default analysis to address the underlying claim on the merits when it presents a more straightforward ground for decision.") (citation omitted).

[135] *Higgins v. Renico*, 470 F.3d 624 (6th Cir. 2006).

[136] *Strickland v. Washington*, 466 U.S. 668 (1984).

> Under *Strickland*, a defendant must establish both that his counsel's performance was seriously deficient and also that he suffered prejudice as a result of such deficiency.[137]

The *Higgins* court then proceeded to discuss the applicable standards for evaluating each prong of the *Strickland* test.  It explained seriously deficient performance in the following terms:

> When complaining of his counsel's deficient performance, a convicted defendant must show that counsel's representation fell below "an objective standard of reasonableness" under "prevailing professional norms."  A reviewing court must judge the reasonableness of counsel's actions on the facts of the defendant's case, viewed from counsel's perspective at the time, recognizing that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  In essence, a defendant has the burden of proving by a preponderance of the evidence, that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."
>
> "Because advocacy is an art not a science, ... [counsel's] strategic choices must be respected" if they were made after a thorough investigation of the law and facts relevant to possible options."  Such choices can vary greatly from attorney to attorney and from case to case, and reviewing courts must scrutinize these choices with a great deal of deference.  Indeed, such strategic choices are virtually unchallengeable.  As explained by the Supreme Court:
>
>> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that

---

[137] *Higgins*, 470 F.3d at 631.

-23-

a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Thus, counsel cannot be adjudged ineffective for performing in a particular way in a case, as long as the approach taken "might be considered sound trial strategy."[138]

The clearly established federal law of establishing prejudice from deficient performance of counsel was stated by the *Higgins* court as follows:

Even where counsel's performance is deficient, a petitioner is not entitled to habeas relief unless he also demonstrates ensuing prejudice.  In evaluating the prejudice suffered by a defendant as a result of his counsel's deficient performance, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceedings."  Indeed, "[v]irtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." Rather, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Although the defendant need not prove that counsel's deficient

---

[138] *Id.* at 631-32 (internal citations omitted).

conduct more likely than not affected the verdict, the defendant must show that "absent his counsel's error, the courts of appeal would have reasonable doubt with respect to his guilt." "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." In this vein, the court must determine whether "the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results."

Whether an error actually prejudiced a defendant is weighed against the "totality of the evidence before the judge or jury." A verdict "only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."[139]

Moreover, it is well-settled that a federal habeas court may, as an initial inquiry, consider either the alleged deficiency itself or the claim of prejudice resulting from such deficiency since establishing both prongs is required to grant the writ.[140]

## C. Application of standards

1. *Ground one's sub-claim alleging ineffective assistance of counsel based on counsel's failure to seek limiting instructions regarding certain testimony should be dismissed as it was never raised in state court and is, therefore, procedurally defaulted.*

In Liles' sole ground for relief, he claims he was denied his Sixth Amendment right to the effective assistance of counsel.[141] In part, he complains that counsel did not seek "sufficient" limiting instructions regarding the testimony of lead investigator Detective

---

[139] *Id.* at 633-34 (internal citations and parenthetical comments omitted).

[140] *Id.* at 631 n.3.

[141] ECF # 1 at 6.

Miller concerning inconsistent statements of key State witnesses.[142]  The State contends that
this claim is procedurally defaulted because Liles never presented it to state court.[143]

　　Liles counters that he did in fact raise this claim on direct appeal, because "a request
for a limiting instruction is included within the concept of a failure to object."[144]  But to
"fairly present" a claim to state court, a petitioner must present to the state courts "both the
factual and legal basis for his claim,"[145] as well as "the same claim under the same theory."[146]
As the State notes, Liles expressly raised an ineffective-assistance claim regarding limiting
instructions for the testimony about "similar acts" he committed, but he was silent as to
counsel's failure to request limiting instructions regarding the other challenged testimony.[147]
Liles also argues that he raised the limiting-instruction sub-claim "as to Dority's testimony"
in his reply brief in the state appellate court.[148]  But in that brief, Liles stated *the fact* that
"there was no limited instruction given" regarding Dority's testimony about Liles' release
from prison for a similar crime.[149]  This statement does not even relate to Miller's testimony,

---

[142]  ECF # 1 at 6.

[143]  ECF # 6 at 29-30.

[144]  ECF # 7 at 7.

[145]  *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).

[146]  *Pillette v. Folte*, 824 F.2d 494, 497 (6th Cir. 1987).

[147]  ECF # 6 at 29-30 (citing ECF # 6, Attachment 2 at 35).

[148]  ECF # 7 at 7 (citing ECF # 6, Attachment 2 at 78).

[149]  ECF # 6, Attachment 2 at 77-78.

and, in any event, does not raise a separate ineffective-assistance claim based on *counsel's failure to request* such a limiting instruction.  Liles never raised in state court an ineffective-assistance claim regarding limiting instructions relating to Detective Miller's testimony.

This sub-claim arises out of the record of proceedings in the trial court.  Under Ohio law, *res judicata* now prohibits Liles from raising the claim in any post-conviction proceeding.[150]  There are no longer any state-court remedies still available to Liles with respect to this ineffective-assistance sub-claim, therefore, and it is procedurally defaulted.[151]

Furthermore, Liles does not offer any argument regarding either the cause for, or prejudice resulting from, his procedural default of the claim.  Nor does contend that he is actually innocent to excuse his procedural default.  This sub-claim should be dismissed.

2.    *Ground one's remaining sub-claims – arguing trial counsel provided ineffective assistance by failing to object to allegedly improper testimony – should be denied on the merits because the state appellate court decision rejecting them neither contravened nor misapplied clearly established Supreme Court precedent.*

The primary focus of Liles' ineffective-assistance claim is that counsel should have objected to certain testimony at trial; specifically, testimony regarding his prior imprisonment for a similar crime, and Detective Miller's testimony about inconsistent statements of the

---

[150]  *See State v. Cole*, 2 Ohio St. 3d 112, 113 (Ohio 1982); *State v. Perry*, 10 Ohio St. 2d 175 (Ohio 1967) (holding that *res judicata* bars a criminal defendant from raising in post-conviction proceedings those claims that could have been raised on direct appeal).

[151]  *See Gray v. Netherland*, 518 U.S. 152, 161–62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . ., it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law' . . . .") (internal citations omitted).

victim, Anthony Brown, that Liles alleges improperly vouched for Brown's credibility.[152]

Liles raised these claims on direct appeal in state court, where they were adjudicated on the

merits.[153]  The State argues the claims lack merit.[154]

       The Supreme Court announced a two-prong test for habeas claims of ineffective

assistance of counsel in *Strickland v. Washington.*[155]  First, the petitioner must demonstrate

that counsel's errors were so egregious that "counsel was not functioning as the 'counsel'

guaranteed the defendant by the Sixth Amendment."[156] Second, the petitioner must show that

he or she was prejudiced by counsel's errors.  To do this, a petitioner must demonstrate "a

reasonable  probability  that,  but  for  counsel's  unprofessional  errors,  the  result  of  the

proceeding  would  have  been  different."[157]   The  Court  has  observed  that  the  standards

---

[152]  ECF # 1 at 6; ECF # 7 at 9-18.  In state court, Liles also raised claims that counsel was ineffective for failing to object to Detective Miller's testimony regarding the inconsistent statements of Dority and Kierra Brown.  *See State v. Liles*, Case No. 1-13-04, 2014 WL 296002, at *13, 2014-Ohio-259.   In his habeas petition, however, Liles complained of counsel's failure to object to the detective's testimony about just one "key State witness . . . ."  ECF # 1 at 6.  And in his traverse, he concedes that his ineffective-assistance claims based on the detective's testimony about Dority and Kierra Brown lack merit and "proposes" that only the ineffective-assistance claim relating to the detective's testimony about Anthony Brown's inconsistent statements "survive."  ECF # 7 at 16.

[153]  *Liles*, 2014 WL 296002, at **11-14.

[154]  ECF # 6 at 18-29.

[155]  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[156]  *Id.* at 687.

[157]  *Id.* at 694.

imposed by *Strickland* and § 2254(d) are both "highly deferential," so that in applying them together, "review is 'doubly' so."[158]

"*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'"[159] Regarding counsel's obligation to object at trial, the Sixth Circuit has explained that "in a trial of any size, numerous potentially objectionable events occur. '[T]he Constitution does not insure that defense counsel will recognize and raise every conceivable constitutional claim.'"[160] Moreover, it has observed,

> experienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. Learned counsel therefore use objections in a tactical manner. In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial to a client that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice.[161]

---

[158] *Harrington v. Richter,* 562 U.S. 86, 105 (2011).

[159] *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (quoting *Strickland,* 466 U.S. at 689-90).

[160] *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006) (citation omitted).

[161] *Id.*

*a.*     *Deficiency of trial counsel's performance*

Here, after correctly setting forth the standards for ineffective-assistance claims under both Ohio and federal law, the state appeals court – the last state court to address the claim – concluded that Liles' counsel did not perform deficiently by not objecting to the testimony Liles challenges.[162]

*I.*     *"Similar acts" testimony*

As to Liles' claim that counsel was ineffective for failing to object to testimony concerning "similar acts" he had committed, the state court opined:

> {¶ 50} Dority testified that a man who identified himself as Liles called her to apologize for shooting her grandson, Brown, and stated "he ain't been too long got out of prison for the same situation, or, for similar to the same situation." (Jan. 22–23, 2013 Tr. at 111). Subsequently, Detective Miller testified that he verified that Liles was just released from prison as Dority testified the caller stated. (Id. at 154, 630 N.E.2d 339). Liles argues that trial counsel was ineffective for failing to object to this testimony because it was inadmissible other-act evidence under Evid.R. 404(B).

> {¶ 51} This argument lacks merit. While Evid.R. 404(B) prohibits other-act evidence "to prove the character of a person in order to show action in conformity therewith," it permits this type of evidence to prove identity. Because the identity of the shooter was the ultimate question at trial, the phone call Dority received was a key piece of evidence answering that question. The identity of the caller was also an issue at trial, which is why the State offered testimony concerning Liles' previous incarceration to confirm that Liles was, in fact, the caller who apologized for the shooting. Therefore, the evidence of Liles'

---

[162] *Liles*, 2014 WL 296002, at **11-14.

prior incarceration was admissible to prove identity, and trial counsel was not ineffective for failing to object to it.[163]

Thus, the state court determined that the testimony in question was admissible under Ohio evidentiary rules, and it therefore could not provide the basis for an ineffective-assistance claim.  As state courts are the final authority on state law, I must defer to, and am bound by, the state court's interpretation of Ohio law on this issue.[164]  This sub-claim lacks merit.

ii.    *Detective Miller's testimony*

As to Liles' claim that counsel was ineffective for failing to object to Detective Miller's testimony about inconsistent statements made by Anthony Brown, the state appellate court reasoned:

> {¶ 52} Next, Liles argues that trial counsel was ineffective for failing to object to Detective Miller's testimony on redirect that Brown's statement while he was recovering in the ICU—that he was hit by a stray bullet—was inaccurate and of "no value." (Jan. 22–23, 2013 Tr. at 153–154). We disagree. To begin with, defense counsel opened the door to this testimony through cross-examination when he asked Detective Miller whether Brown's testimony was consistent with the statements Brown made in the hospital. . . . Also, Detective Miller's testimony on redirect must be viewed in light of his direct testimony that Brown "had just been removed from a breathing machine and

---

[163]    *Id.* at *12.

[164]    *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Warner v. Zent*, 997 F.2d 116, 133 (6th Cir.1993) (absent a showing of "extreme circumstances where it appears that the [state court's] interpretation of [state law] is an obvious subterfuge to evade consideration of a federal issue," the federal habeas court is bound by the state court's determination of state law) (citation omitted).

> appeared to be quite out of it still" when Miller tried to talk with
> Brown in the hospital. . . . Therefore, Detective Miller's
> testimony was not about Brown's credibility as much as it was
> about Brown's physical and mental inability to provide accurate
> information. Since Miller's testimony was not about Brown's
> credibility, trial counsel was not ineffective for failing to object
> to this testimony.[165]

Liles argues that the state appellate court's conclusion that defense counsel opened the door to the detective's opinion about Brown's inconsistent statements was "absurd."[166] He also contends that the court's determination that the detective's testimony about Brown related more to Brown's physical and mental ability to provide information when he was in the hospital than to his credibility was unreasonable, because that kind of an opinion requires "a trained doctor and/or psychiatrist, not a police officer with no training."[167] But, again, I am bound by a state court's interpretation of its own evidentiary rules. The court's interpretation of Detective Miller's testimony was reasonable, and this sub-claim also is meritless.

b.    *Prejudice*

The state appellate court further concluded that Liles was not prejudiced by the admission of the testimony at issue, stating:

> {¶ 56} Finally, even assuming that any of the aforementioned
> testimony was inadmissible, we are not persuaded that Liles
> suffered prejudice. The trial court instructed the jury that it alone

---

[165] *Liles*, 2014 WL 296002, at *12 (citations omitted).

[166] ECF # 7 at 12.

[167] *Id*. at 13.

was the final arbiter of credibility. . . .  The evidence presented at trial established beyond a reasonable doubt that Liles shot Brown. It is clear from the testimony presented that many of the witnesses, including the victim, were initially uncooperative, most likely due to fear of retaliation. Besides the witness testimony, there was evidence that Liles admitted to the shooting himself on three separate occasions. In summary, our confidence in the outcome is not undermined by any possible errors related to trial counsel's failure to object to the aforementioned testimony.[168]

Liles counters that he was significantly prejudiced because his "entire defense" to the State's case was "to attack [the] credibility of the witnesses," but his counsel failed to object to the State's "[u]se [of] the cleanup detective to vouch for the witnesses."[169]  This argument is unpersuasive.  Indeed, Liles does not refute that he himself admitted to the shooting three times.  The state court reasonably determined that given the trial court's instruction to the jury on witnesses' credibility and the strength of the State's evidence against Liles, including the inconsistent but ultimately damaging testimony of the State witnesses, there is no "reasonable probability" that the result of the trial would have been different had counsel objected to the testimony at issue.[170]

Accordingly, the state appellate court's decision rejecting Liles' claim of ineffective assistance of counsel was neither contrary to, nor an unreasonable application of, *Strickland.*

---

[168] *Liles*, 2014 WL 296002, at *14 (citation omitted).

[169] ECF # 7 at 17.

[170] *Strickland*, 466 U.S. 694.

-33-

**Conclusion**

For the foregoing reasons, I recommend that the petition of Desmond R. Liles for a writ of habeas corpus be dismissed.

Dated: August 31, 2016                                s/ William H. Baughman, Jr.
                                                      United States Magistrate Judge

**Objections**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order.[171]

_____

[171] *See*, *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also*, *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).